UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KATAMAN METALS, LLC<br><br>-against-<br><br>MACQUARIE FUTURES USA, LLC | Plaintiff,<br><br><br><br>Defendant. |

CASE NO.: 2022-cv-5272

**COMPLAINT**

Comes Plaintiff, Kataman Metals, LLC ("Kataman" or "Plaintiff"), by counsel, and for its Complaint against Macquarie Futures USA, LLC ("Macquarie" or "Defendant"), states as follows:

**PARTIES**

1. Kataman is a Delaware corporation with its principal offices in St. Louis, Missouri. Kataman is in the business of buying, selling, and trading ferrous and nonferrous metals as well as environmental commodities such as Carbon Emission Credits. As part of its business, Kataman buys and sells Put and Call option contracts in various commodities in the futures market.

2. Macquarie is a company organized under the laws of the state of Delaware with its principal offices at 125 West 55th Street, New York, NY, 10019. Among other things, Macquarie is a brokerage firm in the business of executing and clearing futures contracts on futures exchanges in the United States and internationally. It provides global futures services to institutional clients and commodities and energy producers, among other clients.

**JURISDICTION AND VENUE**

3. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C §1331 as this action asserts a claim arising under federal law, 7 U.S.C. §6b(a)(2), et

1

seq., the Commodity Exchange Act. This Court retains pendant jurisdiction over Kataman's common law claims against Macquarie.

4. Pursuant to Macquarie's Customer Agreement with Kataman, any action against Macquarie such as this must be brought in state or federal court in New York, New York. See, Section 18 of Macquarie's Customer Agreement attached hereto as Exhibit A, and incorporated herein by reference.

5. The amount in controversy exceeds the jurisdictional minimum threshold of this Court.

6. This court has jurisdiction over this action pursuant to Section 18 of the parties' Customer Agreement.

7. Venue is proper in this Court as Macquarie has expressly consented to said venue pursuant to Section 18 of the parties' Customer Agreement.

**STATEMENT OF FACTS**

8. Kataman and Macquarie entered into the Customer Agreement in February, 2012, and did limited business with one another for a short time thereafter.

9. Years later, in January of 2021, Kataman and Macquarie renewed their business relationship. At that time, Kataman wished to trade certain environmental commodity futures contracts, California Carbon Allowances ("CCAs"), and Macquarie agreed to serve as Kataman's clearing house and broker for the purchase and sale of such futures contracts on the Intercontinental Commodities Exchange ("ICE").

10. At the outset in early 2021, Kataman explained its intended trading strategy, specifically that it intended to buy and sell various Call and Put options in CCAs.

11. In early 2021, Macquarie re-vetted Kataman. Macquarie reviewed Kataman's audited financial statements, ensured Kataman's financial wherewithal, approved its creditworthiness, reviewed its trading strategy, established its margin account, and set its trading limits. After completing this process, Macquarie agreed to broker Kataman's trades in CCA options futures contracts and established Kataman's trading account in March of 2021.

12. On or about April 29, 2021, Kataman began trading CCA options through Macquarie on the ICE.

13. After Kataman began acquiring its Put and Call option positions, Macquarie increased Kataman's daily trading limits to allow Kataman to acquire even larger options positions.

14. For example, on May 19, 2021, Kataman requested that its trading limits be increased above 1,000 lots so it could execute larger trades. Macquarie immediately agreed, increasing Kataman's trading limits to 2,000 lots.

15. Kataman spent the next several months building and layering in its futures positions in CCAs. During this time, Macquarie approved every Put and Call option position Kataman acquired, and accepted commissions on each and every trade.

16. On or about June 15, 2021, months after Kataman began trading its Puts and Calls, Macquarie unilaterally decided to triple Kataman's initial margin requirement from one million ($1,000,000) to three million dollars ($3,000,000).

17. Despite this steep increase in the initial margin requirement, Kataman agreed and met this requirement.

18. Despite Kataman fulfilling all obligations under the parties' agreement, on or about June 17, 2021, Macquarie demanded that Kataman close its existing Put positions.

19. At that time, Macquarie promised that if Kataman agreed to close its Put positions, Macquarie would allow Kataman to hold its Call positions until expiry in December of 2021 and Macquarie promised further that it would reduce the three times (3X) multiplier on Kataman's initial margin requirements ("June 17, 2021 Agreement"). See, June 17, 2021, Email from Macquarie to Kataman, attached hereto as Exhibit B, and incorporated herein by reference.

20. Based on Macquarie's promises, Kataman accepted Macquarie's terms. Kataman accepted this bargain even though closing or liquidating its Put positions at that time meant Kataman would incur a significant loss on said Put positions. Specifically, Kataman incurred a $757,500 loss closing its Put positions at that time. Further, had Kataman been permitted to hold its Put positions through expiry, Kataman would have earned a profit of $952,500 on these Put positions.

21. Consequently, in reliance on Macquarie's promises to induce Kataman to enter into the parties' June 17, 2021, Agreement, Kataman lost $1,710,00 associated with its Put positions.

22. Notwithstanding the parties June 17, 2021, Agreement and notwithstanding Kataman's financial sacrifices associated with the bargain, Macquarie refused to uphold its end of the agreement. Specifically, on September 1, 2021, Macquarie abruptly demanded that Kataman close or transfer to another brokerage firm all its Call positions. Macquarie also refused to reduce the three times (3X) multiplier on Kataman's initial margin requirement as promised.

23. In early September, 2021, Macquarie threatened that if all Call positions were not closed or transferred by the end of September, Macquarie would unilaterally close Kataman's Call positions for them.

24. Macquarie's actions were a clear breach of the parties' June 17, 2021, Agreement.

4

25. As a result of Macquarie's threats, Kataman made efforts to transfer its Call positions to another brokerage firm but could not do so in the time allotted by Macquarie.

26. Due to Macquarie's breaches and threats, Macquarie forced Kataman to close its Call positions by the end of September, 2021.

27. Forcing Kataman to close its Call positions in September of 2021 resulted in significant losses to Kataman.

28. If Kataman had been permitted to hold its Call positions through expiry in December, 2021, as promised, Kataman would have avoided substantial, multi-million dollar losses it incurred liquidating its Call positions in September and Kataman would instead have reaped multi-million dollar profits when these Call positions expired in December, 2021.

29. Based on the ultimate closing prices in December of 2021, Kataman lost $12,315,750 on its Call positions alone as a result of Macquarie's actions.

30. In addition to these losses, Kataman expended $770,830 in brokerage and clearing fees, much of which was paid to Macquarie for the purpose of acquiring the very Put and Call positions Macquarie later forced Kataman to relinquish.

31. In addition to these losses, from April to September of 2021, Macquarie willfully and wrongfully withheld approximately fourteen million dollars ($14,000,000) in variation margin account funds belonging to Kataman.

32. The above-described variation margin account funds should have been remitted, distributed and/or refunded to Kataman long before Macquarie ultimately remitted the funds to Kataman in October of 2021.

33. In the summer of 2021, Kataman inquired concerning the apparent deficiency in Macquarie's refund of these variation margin account funds, but Macquarie represented that no such funds due Kataman were being withheld.

34. In truth, Macquarie was improperly withholding approximately $14,000,000 in variation margin account funds belonging to Kataman.

35. Macquarie intentionally withheld these funds and concealed from Kataman that it was doing so solely to serve its own interests. On information and belief, Macquarie wrongfully withheld these funds to further pressure Kataman to close its Call positions in September, 2021.

36. Failing and/or refusing to properly and timely remit Kataman's variation margin account funds was a further breach of Macquarie's contractual duties to Kataman.

37. Macquarie's failure and/or refusal to properly and timely remit Kataman's variation margin account funds, and Macquarie's concealment of the fact it was withholding these funds, constitutes fraud by Macquarie.

## **COUNT I- BREACH OF CONTRACT**

38. Kataman re-alleges and incorporates by reference each and every preceding paragraph of the Complaint as if fully set forth here.

39. Macquarie's refusal to permit Kataman to hold its Call positions through expiry in December of 2021, was a breach of the parties' June 17, 2021, Agreement.

40. Macquarie's failure and/or refusal to reduce Kataman's three times (3X) multiplier on Kataman's initial margin requirement was a further breach of the parties' June 17, 2021, Agreement.

41. Macquarie's refusal to remit overages in Kataman's variation margin account funds on a daily and/or timely basis constitutes a further breach of the parties' agreement.

42. As a result of the aforesaid breaches, Kataman sustained significant damages.

43. As a result of Macquarie's breach of contract, Kataman has suffered damages in the excess of $14,795,580.

44. As a result of Macquarie's multiple breaches of the parties' agreements, Kataman has suffered additional consequential damages for which Kataman is entitled to recovery, all in an amount to be proven at trial.

## COUNT II- COMMON LAW FRAUD REGARDING JUNE 17, 2021 REPRESENTATIONS

45. Kataman re-alleges and incorporates by reference each and every preceding paragraph of the Complaint as if fully set forth here.

46. Macquarie knowingly, falsely, and intentionally represented to Kataman that if Kataman closed its Put positions, Macquarie would permit Kataman to hold its Call positions until expiry in December of 2021. Macquarie also knowingly, falsely and intentionally represented that if Kataman closed its Put positions, Macquarie would reduce Kataman's initial margin requirement.

47. Macquarie's representations were material and such representations were made with the intent to induce Kataman to rely on them.

48. Kataman justifiably and/or reasonably relied on said representations and took action to its detriment on said reliance.

49. Macquarie's representations in this regard were fraudulent.

50. As a result of Macquarie's fraudulent representations, Kataman suffered monetary losses in an amount to be determine at trial.

51. As a result of Macquarie's fraudulent representations, Kataman is entitled to the recovery of punitive damages in an amount to be determined at trial.

### COUNT III – COMMON LAW FRAUD REGARDING VARIATION MARGIN ACCOUNT

52. Kataman re-alleges and incorporates by reference each and every preceding paragraph of the Complaint as if fully set forth here.

53. Macquarie knowingly, falsely, and intentionally represented to Kataman that it owed Kataman no variation margin account funds when in fact it knew it did. Macquarie made such representations with the intent Kataman would rely on said representations.

54. Kataman justifiably relied on Macquarie's representations that it was not owed a refund on its variation margin account.

55. Furthermore, Macquarie's failure to properly disclose Kataman's variation margin account balance constitutes fraudulent concealment by Macquarie.

56. In October of 2021, the month after Macquarie forced Kataman to close its Call positions, Macquarie remitted fourteen million dollars ($14,000,000) in overdue variation margin account funds.

57. For months preceding October, 2021, Macquarie fraudulently denied it was withholding substantial variation margin account funds belonging to Kataman.

58. As a result of Macquarie's fraudulent misrepresentations and fraudulent concealment, Kataman suffered damages, all in an amount to be proven at trial.

59. As a result of Kataman's fraudulent representations and fraudulent concealment with respect to Kataman's variation margin account, Kataman is entitled to the recovery of punitive damages.

### COUNT IV- VIOLATION OF COMMODITY EXCHANGE ACT

60. Kataman incorporates by reference each and every preceding paragraph of the Complaint as if fully set forth here.

61. The aforementioned actions of Macquarie constitute violations of 7 USCS §6b(a)(2)(A) and (B) of the Commodity Exchange Act.

62. Pursuant to 7 U.S.C. § 6b (a) (2), it is unlawful for any person, in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery to "cheat or defraud or attempt to cheat or defraud the other person."

63. Pursuant to this same federal statute, it unlawful for any person, in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery "willfully to make or cause to be made to the other person any false report or statement."

64. Macquarie's fraud referenced herein constitutes fraud or deceit in connection with futures transactions.

65. Macquarie's false statements or omissions were made with knowledge of their falsity or were made in reckless disregard of their falsity.

66. Macquarie's false and material misrepresentations and omissions were made with the intent to induce Kataman's reliance.

67. Kataman justifiably and/or reasonably relied on Macquarie's false and/or reckless misrepresentations.

68. Kataman suffered damages as a result of Macquarie's false misrepresentations.

69. As a result of Macquarie's wrongful conduct described herein and as a result of Macquarie's violations 7 U.S.C. §6b(a)(2) of the Commodities Exchange Act, Kataman is entitled to the recovery of compensatory and punitive damages, all in an amount to be determined by the trier of fact at trial.

## COUNT V- BREACH OF GOOD FAITH AND FAIR DEALING

70. Kataman re-alleges and incorporates by reference each and every preceding paragraph of the Complaint as if fully set forth here.

71. Macquarie's failure and refusal to honor the terms of the parties' June 17, 2021, Agreement constitutes a breach of its duty of good faith and fair dealing.

72. Macquarie's failure and refusal to remit variation margin account funds to Kataman on a daily and/or timely basis constitutes a breach of its duty of good faith and fair dealing.

73. As a result of Macquarie's breach of its duty of good faith and fair dealing, Kataman suffered monetary damages.

74. As a result of Macquarie's breach of its duty of good faith and fair dealing, Kataman is entitled to compensatory damages in an amount to be proven at trial.

## COUNT VI – UNJUST ENRICHMENT

75. Kataman re-alleges and incorporates by reference each and every preceding paragraph of the Complaint as if fully set forth here.

76. As a result of the actions by Macquarie referenced above, Macquarie was unjustly and improperly enriched.

77. As a result of Macquarie's unjust enrichment, Kataman is entitled to the recovery of compensatory damages in an amount to be determined at trial.

## COUNT VII – PROMISSORY ESTOPPEL

78. Kataman re-alleges and incorporates by reference each and every preceding paragraph of the Complaint as if fully set forth here.

79. On June 17, 2021, Macquarie promised it would allow Kataman to hold its Call positions through expiry.

80. Kataman relied to its detriment on said promise by Macquaie, and took action to its detriment in reliance on said promise.

81. Macquarie failed to keep its promise and Kataman suffered damages as a consequence.

82. Under the doctrine of promissory estoppel, Macquarie is liable to Kataman for the damages it caused in failing to keep its promise.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Judgment against Defendant for actual and compensatory damages under Count I herein;

B. Judgment against Defendant for actual, compensatory, and punitive damages under Count II herein;

C. Judgment against Defendant for actual and compensatory, and punitive damages under Count III herein;

D. Judgment against Defendant for actual and compensatory, and punitive damages under Count IV herein;

E. Judgment against Defendant for actual and compensatory damages under Count V herein;

F. Judgment against Defendant for actual and compensatory damages under Count VI herein;

G. Judgment against Defendant for actual and compensatory damages under Count VII herein;

H. Its costs expended herein, including its reasonable attorney's fees;

    I.        Pre-judgment interest and post-judgment interest;

    J.        The right to amend this Complaint, if necessary and if warranted by the discovery of additional facts;

    K.       Any and all other relief to which Plaintiff may appear entitled.

Dated: June 22, 2022  
New York, New York

Respectfully submitted,

/s/ Stephen P. Younger  
Stephen P. Younger  
John Murray  
FOLEY HOAG LLP  
1301 Avenue of the Americas  
New York, New York 10019  
Telephone: (212) 812-0400  
Email: spyounger@foleyhoag.com  
Email: jmurray@foleyhoag.com


/s/ Glenn A. Cohen  
Glenn A. Cohen (*pro hac vice motion forthcoming*)  
Allison P. Dempsey (*pro hac vice motion forthcoming*)  
Lynn M. Watson (*pro hac vice motion forthcoming*)  
SEILLER WATERMAN LLC  
Meidinger Tower, 22nd Floor  
462 S. Fourth Avenue  
Louisville, Kentucky 40202  
Telephone: (502) 584-7400  
Facsimile: (502) 583-2100  
E-mail: gcohen@derbycitylaw.com  
E-mail: dempsey@derbycitylaw.com  
Email: lwatson@derbycitylaw.com

*Counsel for Plaintiff, Kataman Metals, LLC*