UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                         :
KATAMAN METALS, LLC,                     :
                                         :
                          Plaintiff,     :        22cv5272 (DLC)
                                         :
             -v-                         :        OPINION AND
                                         :            ORDER
MACQUARIE FUTURES USA, LLC,              :
                                         :
                          Defendant.     :
                                         :
--------------------------------------- X

APPEARANCES:

For plaintiff Kataman Metals, LLC:
Stephen P. Younger
Paul F. Downs
Foley Hoag LLP
1301 Avenue of the Americas
New York, NY 10019

Glenn A. Cohen
Lynn Watson
Allison P. Dempsey
Seiller Waterman LLC
Meidinger Tower, 22nd Floor
462 S. Fourth Avenue
Louisville, KY 40202

For defendant Macquarie Futures USA, LLC:
Rachel B. Goldman
Allan N. Taffet
Joshua C. Klein
Bracewell LLP
31 W. 52nd Street, Suite 1900
New York, NY 10019

DENISE COTE, District Judge:

     Kataman Metals, LLC ("Kataman") brings this action against

Macquarie Futures USA, LLC ("Macquarie") based on events that

occurred while Macquarie served as a broker for Kataman for the purchase and sale of certain futures contracts.  Macquarie asserts several state law claims, as well as a single federal claim under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6b(a)(2), et seq.  For the following reasons, the motion to dismiss the CEA claim is granted.  The Court declines to exercise supplemental jurisdiction over the state law claims.

## Background

The following facts are taken from the first amended complaint ("FAC").  For the purposes of deciding this motion, the FAC's factual allegations are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor.

Kataman is a Delaware corporation with its principal place of business in Missouri.  Kataman's business includes buying and selling put and call option contracts in various commodities in the futures market.  Macquarie is a company also organized under the laws of Delaware with its principal place of business in New York.  Macquarie serves as a futures commission merchant, or broker, that executes and clears futures contracts on futures exchanges.

Kataman and Macquarie entered into an agreement in February 2012 (the "Customer Agreement") under which Macquarie served as

Kataman's broker.  The Customer Agreement provides in relevant part that Kataman

> agrees at all times to deposit and maintain such margins and premium payments with [Macquarie] as [Macquarie] may from time to time request (orally or in writing).

(Emphases added.)  It also states that if at any time

> the Account does not contain the margin required by [Macquarie] . . . [or] [Macquarie] in its reasonable discretion considers it necessary for its protection, [Macquarie] may in its sole discretion, after [Macquarie] has notified, or attempted in good faith to notify, [Kataman] of its intentions, terminate, liquidate and/or accelerate any and all Contracts, close out the Account or any open positions of [Kataman] in whole or in part, cancel any or all pending orders, terminate [Kataman]'s right to trade in the Account, or take any other action it deems necessary to protect itself, and [Kataman] will be liable for any deficiency in the Account that may result from such actions.

(Emphases added.)

Kataman and Macquarie renewed their business relationship under the Customer Agreement in January 2021 when Macquarie agreed to serve as Kataman's broker for certain environmental commodity futures contracts called California Carbon Allowances ("CCAs").  Kataman's intent at the time was to buy and sell corresponding and offsetting put and call option positions in CCAs, which Kataman explained to Macquarie.  Kataman began trading CCA options in late April 2021.

On or about June 15, 2021, Macquarie unilaterally tripled Kataman's initial margin requirement, which required Kataman to post roughly $2 million in additional margin.  The following day, Macquarie's Senior Vice President, David Coates, and a representative from Kataman, Bradley Clark, discussed a proposal whereby if Kataman agreed to close its put positions, Macquarie would allow Kataman to hold its call positions until they expired in December 2021 and would eliminate the triple multiplier on Kataman's initial margin requirement.  Clark agreed to this proposal on behalf of Kataman.

On June 17, Coates sent Clark a text message noting that he "got approval overnight that if you close the puts we can run the calls through to expiry" and that once the put positions were closed, Macquarie "can also rescue the margin multiplier." Later that day, Coates also sent Clark and another Kataman representative an email that stated in relevant part:

> Following our discussions yesterday I have received approval from Global Management as follows:
>
> - Kataman buys back the positions in Puts;
> - Once the Puts have been closed out Macquarie can reduce the margin multiplier;
> - The remaining Call positions can be held until expiry in December

The email also explained that

> [w]hen the Puts have been closed, and assuming the market remains relatively static, the reduction in the margin multiplier will result in an excess in

> Kataman's account which will be available to call
> back.

Accompanying the email was a margin notice that requested that Kataman send the additional margin funds to meet the triple multiplier.

Kataman agreed to this plan, paid the additional margin requirement, and began closing its put positions.  Macquarie earned commissions and fees on each trade placed by Kataman as Kataman closed out these positions.  In the weeks during which Kataman closed out its put positions, it did not search for another broker.  After closing all its put positions, Kataman lost $1,710,000 associated with the positions.

Even though Kataman closed all its put positions, Macquarie did not reduce the triple multiplier on the initial margin account.  Later, on September 1, Macquarie also required Kataman either to close its call positions or transfer them to another broker by the end of the month.  Clark approached Coates, objecting to Macquarie's demand based on Coates's representations to Clark in June.  Coates responded to Clark that "he knew they had an agreement, but there was nothing he could do."

Kataman then tried to transfer its call positions to another broker but was unable to do so before the end of September.  Thus, Kataman was required to close almost all of

its call positions at the end of the month.  According to
Kataman, it lost $12,315,750 in realized and potential profits
on the call positions.  Additionally, Kataman spent almost
$800,000 in brokerage and clearing fees, much of which was paid
to Macquarie.

Kataman filed this action on June 22, 2022.  Jurisdiction
is premised on 28 U.S.C. § 1331 because the plaintiff asserts an
action arising under federal law.  On September 2, Macquarie
moved to dismiss the complaint.  The plaintiff was ordered to
oppose the motion or file an amended complaint and was warned
that it would likely not have a further opportunity to amend its
complaint.

The plaintiff filed the FAC on September 23.  That same
day, the defendant's September 2 motion was terminated as moot.
The FAC asserts claims for breach of contract, promissory
estoppel, common law fraud, violation of the CEA, breach of the
duty of good faith and fair dealing, and unjust enrichment.  The
defendant moved to dismiss the FAC on October 31.  The motion
was fully submitted on January 24, 2023.

## Discussion

I.   CEA

Plaintiff's sole federal claim is a claim for fraud under
§ 4b of the CEA.  The CEA is a "remedial statute that serves the

crucial purpose" of protecting investors "from being misled or deceived." Prime Int'l Trading, Ltd. v. BP P.L.C., 937 F.3d 94, 101 (2d Cir. 2019) (citation omitted).  The statute includes a private right of action for plaintiffs to enforce its substantive provisions.  Id.; see 7 U.S.C. § 25(a)(1).

Section 4b of the CEA provides in relevant part that it is unlawful

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person . . .
>
> > (A)   to cheat or defraud or attempt to cheat or defraud the other person;
> >
> > (B)   willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record . . . .

7 U.S.C. § 6b(a)(2)(A)-(B) (emphases added).

"Claims sounding in fraud must satisfy the heightened pleading standards of Federal Rule of Civil Procedure Rule 9(b)." Olson v. Major League Baseball, 29 F.4th 59, 71 (2d Cir. 2022).  This requires the plaintiff to:

> (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.

Id. (citation omitted).

7

Under Rule 9(b), mental states may be alleged generally, but courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (citation omitted). Thus, plaintiffs must "allege facts that give rise to a strong inference of fraudulent intent." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 171 (2d Cir. 2015) (citation omitted). A plaintiff can properly plead the requisite inference by alleging either (a) facts that show that the defendant "had both a motive and opportunity to commit fraud," or (b) facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." United States v. Strock, 982 F.3d 51, 66 (2d Cir. 2020) (citation omitted).

The plaintiff's CEA claim is dismissed. The plaintiff has failed to plead facts that give rise to a strong inference of fraudulent intent, as required by Rule 9(b). At the outset, Kataman's CEA fraud theory is based on alleged promises made on June 16 and 17, 2021 about Macquarie's actions in the future, not misrepresentations about past or present facts.[1] A

---

[1] In opposition to this motion to dismiss, plaintiff suggests a second theory -- that Macquarie's disagreement with Kataman about Kataman's margin fund account balance constitutes

defendant's failure to follow through on its promises is not
enough to show fraudulent intent.  See, e.g., U.S. ex rel.
O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 658-62
(2d Cir. 2016).  Thus, to give rise to a strong inference of
fraudulent intent, the FAC would need to plausibly plead that
Macquarie never intended to adhere to its promises.  It does not
do so.

The FAC alleges that Macquarie had an "economic motive to
misrepresent its intentions" because it continued to receive
commissions before ultimately closing the call positions, and it
retained the additional $2 million margin funds to protect
itself in the interim.  This is insufficient to plead fraudulent
intent.  First, Macquarie was already empowered under the
Customer Agreement to require additional margin funds from
Kataman upon request and to "close out the Account or any open
positions of [Kataman] in whole or in part" in Macquarie's "sole
discretion."  Thus, it had no need to rely on misrepresentations
to accomplish either of those results.  Second, the fact that
Macquarie continued to receive payments from Kataman as part of

fraudulent concealment.  It is unclear if this concealment
theory is intended to apply solely to Kataman's state law fraud
claims or also to its CEA claim.  To the extent that Kataman
intends to bring a CEA claim based on this theory, the FAC fails
to plea this theory with the particularity required by Rule
9(b).

an ongoing business relationship is insufficient to suggest that
Macquarie did not intend to follow through on its June 2021
statements.  See, e.g., Ganino v. Citizens Utils. Co., 228 F.3d
154, 170 (2d Cir. 2000) ("General allegations that the
defendants acted in their economic self-interest are not
enough.").

Kataman argues that there is strong circumstantial evidence
of conscious misbehavior or recklessness based on Macquarie's
withholding of additional margin funds.  Specifically, Kataman
notes that, separate from the initial margin requirement,
Macquarie also held daily "variation margin funds" that,
pursuant to agreed-upon parameters, should have been refunded to
Kataman as Kataman began closing its positions.

These allegations, too, are inadequate to show a strong
inference of fraudulent intent when making the June statements.
The bulk of these allegations are pled too generally to meet the
dictates of Rule 9(b).  The FAC alleges, for example, that
"throughout the period of June-September of 2021" Clark
"continually asked Coates" about the margin funds in question,
and Coates "willfully lied" that Kataman was not due a refund of
the funds.  The only fact pled with particularity is that on
September 30, 2021, Clark wrote Coates noting that Kataman was
"struggling to understand why we have [not] received more margin

back after closing" several positions.  In response, Coates

asked, "what kind of numbers were you anticipating?"  Clark

replied that Macquarie was holding $18 million in margin funds,

but, in Kataman's view, only about $3 million could be

justified.

These allegations, although particularized, do not give

rise to a strong inference of fraudulent intent either with

respect to the June statements or with respect to the September

discussion of margin balances.  Notably, Kataman concedes in the

FAC that, in the weeks following this exchange, Macquarie

remitted the funds in question.  Moreover, plaintiff fails to

address the language of the Customer Agreement that empowered

Macquarie to require additional margin funds from Kataman upon

request.

Thus, plaintiff has failed to plead facts that give rise to

a strong inference of fraudulent intent.  At bottom, this case

is about promises that were allegedly broken by Macquarie.

Because there are insufficient facts to suggest that Macquarie

made those statements with fraudulent intent, Kataman has not

adequately pled a claim for fraud under the CEA.

II.  Supplemental Jurisdiction

The plaintiff's remaining claims are state law claims.  A

district court may decline to exercise supplemental jurisdiction

over a state law claim if "the claim raises a novel or complex
issue of State law" and/or the district court "has dismissed all
claims over which it has original jurisdiction."  8 U.S.C.
§ 1367(c)(1), (3).  Once a court has dismissed all federal
claims, it must decide whether the traditional values of
"economy, convenience, fairness, and comity" counsel against the
exercise of supplemental jurisdiction.  Catzin v. Thank You &
Good Luck Corp., 899 F.3d 77, 85 (2d Cir. 2018) (citation
omitted).

> In weighing these factors, the district court is aided
> by the Supreme Court's additional guidance in
> [Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343
> (1988),] that in the usual case in which all federal-
> law claims are eliminated before trial, the balance of
> factors will point toward declining to exercise
> jurisdiction over the remaining state-law claims.

Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d
Cir. 2006).  Likewise, it "is well settled that where . . . the
federal claims are eliminated in the early stages of litigation,
courts should generally decline to exercise pendent jurisdiction
over remaining state law claims."  Whiteside v. Hover-Davis,
Inc., 995 F.3d 315, 325 (2d Cir. 2021) (citation omitted).

There is no reason in this case to depart from the ordinary
practice of dismissing the remaining state law claims.  The sole
federal claim has been resolved, and the case is in its early
stages.  Judicial economy and comity weigh in favor of the

dismissal.  The plaintiff makes no argument in support of supplemental jurisdiction.  Accordingly, the Court will not exercise supplemental jurisdiction over the state law claims.

## Conclusion

The defendant's October 31, 2022 motion to dismiss is granted.  The CEA claim is dismissed with prejudice.  The Court declines to exercise supplemental jurisdiction over the state law claims, and they are dismissed without prejudice to refiling in state court.  The Clerk of Court shall close the case.

Dated:     New York, New York
           April 4, 2023

                                        _____
                                            DENISE COTE
                                  United States District Judge

13